# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | |
|---|---|
| **WINFRED JULY,**             ) | |
| ) | |
|      **Plaintiff,**           ) | |
| ) | |
| **v.**                            ) | **CIVIL ACTION 11-0635-WS-N** |
| ) | |
| **BOARD OF WATER AND SEWER** ) | |
| **COMMISSIONERS OF THE CITY OF** ) | |
| **MOBILE,**                 ) | |
| ) | |
|      **Defendant.**         ) | |

## ORDER

This matter comes before the Court on defendant's Motion for Summary Judgment (doc. 20).  The Motion has been briefed and is now ripe for disposition.

## I.  Nature of the Case.

Plaintiff, Winfred July, brought this action against his former employer, the Board of Water and Sewer Commissioners of the City of Mobile (the "Board" or "MAWSS"), asserting claims for relief under the Americans with Disabilities Act, 42 U.S.C. §§ 12101 *et seq.* ("ADA"), and the Rehabilitation Act, 29 U.S.C. § 794.  The Complaint alleges that "[t]he relief sought results from defendant's failure and/or refusal to modify Plaintiff's work environment to accommodate his disability (generally, severe reoccurring migraine headaches), and the subsequent termination of his employment because he complained to his employer of the denial of these rights."  (Doc. 1, ¶ 2.)  According to the Complaint, July "was terminated because he complained about a needed accommodation.  Further, during his employment, the Defendant failed or otherwise refused to provide him an accommodation which was necessary for him to become a successful employee, notwithstanding his disabilities."  (*Id.*, ¶ 12.)

The Complaint purports to assert four causes of action against the Board.  First, July claims that the Board violated Title I of the ADA by "failing, on numerous occasions, to provide him a reasonable accommodation;" "[d]isciplining him for seeking an accommodation which MAWSS had promised to provide;" and "[t]erminating his employment because he spoke out on

a matter that Title I of the [ADA] makes unlawful." (*Id.*, ¶ 65.)  Second, July alleges that the Board violated Title II of the ADA in the same manner via the same conduct. (*Id.*, ¶ 72.)  Third, July maintains that the Board violated the Rehabilitation Act in the same manner via the same conduct. (*Id.*, ¶ 76.)  And fourth, July contends that the Board violated the anti-retaliation provisions of the ADA and the Rehabilitation Act by firing him in close proximity to an occasion on which he "spoke out about his need for an accommodation due to his disability." (*Id.*, 79.)

The Board now moves for summary judgment on numerous grounds, including arguments that (i) July failed to exhaust his failure-to-accommodate claim before the Equal Employment Opportunity Commission; (ii) the Board in fact accommodated his purported disability; (iii) the Board had compelling reasons for terminating July's employment that rebut any inference of discrimination or retaliation; and (iv) July has not made the requisite showing that the Board is covered by the Rehabilitation Act.  Plaintiff contests all of these bases for summary judgment.

## II.  Factual Background.[1]

### A.  *Plaintiff's Employment History at MAWSS.*

Winfred July worked for the Mobile Area Water and Sewer System ("MAWSS") for some 16 years, from March 1995 through his discharge in July 2011. (July Aff. (doc. 25), ¶ 3; July Dep. (doc. 22), at 19.)  His job title was "Public Service Worker" until 2004, when he was promoted to "Equipment Operator II," a position he held for the remainder of his time at MAWSS. (July Aff., ¶ 3.)  As an Equipment Operator II, July's "basic work was to clean those [lift] stations or pump-down stations or other general stuff they needed, but [his] main thing was there to clean those stations." (July Dep., at 27.)[2]  There were more than 200 lift stations in the system, and on a given day July could be assigned to any of them. (*Id.* at 28.)  To reach those

---

[1]  The Court is mindful of its obligation under Rule 56 to construe the record, including all evidence and factual inferences, in the light most favorable to the nonmoving party. *See Skop v. City of Atlanta, GA*, 485 F.3d 1130, 1136 (11th Cir. 2007).  Thus, plaintiff's evidence is taken as true and all justifiable inferences are drawn in his favor.

[2]  A "lift station" collects sewage from homes and businesses, then pumps out the sewage when it reaches a certain level.  Over time, grease, residue and debris accumulate at the lift station, such that it requires cleaning. (*Id.*)  The interval of cleaning for a lift station ranges from as frequent as once every three to four months to as infrequent as once a year. (*Id.* at 29.)

locations and perform his duties, July and his helper would drive a "big, bulky truck" or a "combo truck," as assigned by MAWSS. (*Id.* at 29-30.) These trucks were equipped with hoses that July and his helper would use to vacuum up the debris from the lift stations into a storage tank onboard the trucks. (*Id.* at 31-32.)

July's 16-year employment history at MAWSS was marked by several disciplinary actions. Of some relevance to this dispute, in February 2011 MAWSS suspended July for 20 working days without pay based on a January 18, 2011 incident in which he was directed to "walk and inspect the force mains," but did not do so. MAWSS concluded that July's failure to perform these duties "constitutes insubordination and violation of any lawful or reasonable regulations or order made and given by a superior officer." (July Dep., Exh. 9.)[3] The incidents that form the basis of this lawsuit took place shortly after July returned to work from that suspension.

### B.    Plaintiff's Medical Condition and Requested Accommodation.

For many years, July had suffered from chronic migraine headaches. He describes them as being "like a hammer pounding," with symptoms including nausea, dizziness, diarrhea and even blackouts. (July Aff., ¶ 4.) In a note dated August 21, 2007, July's treating neurologist, Dr. Ilyas Shaikh, advised MAWSS that July "should avoid extreme weather so that he will have less provocation of headaches" and that he "should be exposed to extreme heat as tolerated." (Doc. 25, Exh. A.) Based on Dr. Shaikh's letter, MAWSS notified July "that he could take breaks as needed in the truck, which was air conditioned. This was done because only Mr. July could determine his tolerance for extreme heat." (Doc. 25, Exh. B at #4.) July acknowledges that he

---

[3]    As was his right, July appealed that 20-day suspension to the Mobile County Personnel Board, which not only affirmed MAWSS' decision but elevated it to a 30-day suspension. (July Dep., at 75-76.) The Personnel Board's written conclusions of April 12, 2011, included the following: "July never called his supervisor to report any problems but instead simply did not perform the work required. … The employee was well aware of the job requirements …. He simply chose not [to] perform a proper inspection on January 18, 2011 and did [not] advise his supervisor of any impediment to doing so. His response to criticism was to 'take it to HR.' This response and the employee's conduct demonstrate insubordination and the failure to follow reasonable orders which justify the discipline imposed by this order." (July Dep., Exh. 10, at 10-11.) The Personnel Board also remarked that it "was not favorably impressed by Mr. July's contentious demeanor" during the hearing. (*Id.* at 11.)

does not require an air-conditioned truck at all times, but that "[i]t's just when it's real hot, you know, it makes my head hurt." (July Dep., at 99.)

MAWSS' accommodations for July's migraine headache condition went beyond allowing him to take breaks as needed. Indeed, as far back as June 2004, MAWSS borrowed or purchased air-conditioned vactor trucks so as "to allow Mr. July to drive or be passenger in an air conditioned truck." (Doc. 25, Exh. B at #13.)[4] Plaintiff admits that defendant took these measures for him; indeed, he avers that his doctor notified MAWSS that July "need[s] to ride or drive in a vehicle that has an air condition in it when the temperature is 80 degrees or above," and that "[i]n response to Dr. Sawyer's diagnosis MAWSS purchased a new truck which had working air conditioning which was assigned to me." (July Aff., ¶ 5.) Both sides concur that July's physician specified that he required use of an air-conditioned truck only when outside temperatures exceeded 80 degrees. (Doc. 25, Exh. B at #6-7; King Dep. (doc. 25, Exh. D), at 58 ("The doctor's statement he brought in said when the temperature is at 80 degrees or above.").)[5] For purposes of this Rule 56 Motion, plaintiff articulates no dissatisfaction with this accommodation, and does not contend that MAWSS was required to do anything more to accommodate his migraine headache condition.

### C. Events of May and June 2011.

#### 1. The May 24 Altercation.

The key event underlying this litigation occurred on May 24, 2011. At approximately 6:00 a.m. that morning, July's supervisor, Terry Herman, conducted a department-wide meeting to issue assignments and work schedules. (July Dep., Exh. 13, at 2.) The outside temperature was 74 degrees. (King Dep., at 64.) During the meeting, Herman instructed July to take truck

---

[4]     This accommodation was not a trivial undertaking. Indeed, the record shows that MAWSS borrowed an air-conditioned vactor truck from another department for July's use in June 2004, then permanently transferred an air-conditioned vactor truck to the lift station in August 2004 for July's benefit. (Doc. 22, Exh. 2, at #13.) In July 2005, MAWSS purchased a new vactor truck with air conditioning, again for July's benefit. (*Id.*)

[5]     To be clear, this physician imposed no other restrictions on plaintiff's ability to work in the heat. Indeed, the same doctor who fixed the 80-degree threshold for access to air-conditioned trucks also notified MAWSS that "I see no need for any other restrictions. … He reports he doesn't have difficulty working out in the heat just in the closed cab of the truck when it is hot." (Doc. 25, Exh. B at #7-8.)

#16 (which was equipped with air conditioning) to clean three separate lift stations.  (July Aff., ¶ 15.)  Without checking the vehicle or waiting until the meeting concluded, July objected that the air-conditioning unit in truck #16 was broken.  (*Id.*)[6]  Herman responded that he was not going to shut down a job because of air conditioning.  In response, July balked that he had a condition that caused heat-induced migraines, to which Herman replied, "I don't care about your condition." (July Aff., ¶ 16.)[7]  Herman instructed July to discuss the matter with him after the department-wide meeting ended.  (Doc. 25, Exh. C, at 2.)  Immediately after the meeting, July confronted Herman in the hallway, yelling at him, "This don't make any sense.  Y'all know I can't work like this."  (*Id.*)  Herman asked July to come to his office to discuss the matter, but before they even reached his office, July shouted, "You can't tell me what truck I can drive; you don't have the authority to do it.  I'm not driving a truck without air."  (*Id.*)

Finally, Herman succeeded in getting July (along with witnesses) into his office.  By all accounts, both Herman and July were angry and loud.  (July Aff., ¶ 18; July Dep., Exh. 13, at 3, 8, 11.)  Herman explained, "I wanted him to just do his job."  (Doc. 25, Exh. C, at 2.)  July

---

[6]　　　As it happens, July was mistaken.  The air-conditioning unit on truck #16 had already been repaired by a MAWSS mechanic, and was functioning normally.  (July Dep., Exh. 13, at 3, 6-7.)  July was unaware that repairs had been completed until sometime later on the morning of May 24.  Had he simply gone to truck #16 and cranked it up when directed by his supervisor, rather than initiating and escalating conflict with him, July would have known that the air conditioner was working and the entire May 24 incident could have been avoided. Unfortunately, July chose a different path with a different outcome.

[7]　　　Plaintiff offers no evidence that Herman had actual knowledge of July's migraine headaches and need for the particular accommodation of an air-conditioned truck.  At best, July speculates that Herman "was aware" of this situation because of a discussion sometime in 2010 where July notified Herman that he needed to be in an air-conditioned truck.  (July Aff., ¶ 17.) But plaintiff does not offer evidence that Herman was aware on the morning of May 24, 2011 that July continued to require such accommodations.  July's self-serving speculation concerning what Herman knew or did not know is not properly considered on summary judgment.  *See* Rule 56(c)(4) (stating that summary judgment affidavits "must be made on personal knowledge" and "set out facts that would be admissible in evidence").  By contrast, Herman's testimony is that his understanding that morning was that there were no remaining work restrictions on July, and that air-conditioning was not a continued requirement for him.  (July Dep., Exh. 13, at 3-4.) Herman did not work in the department when the issue first arose, so he simply was not aware of it.  (Doc. 25, Exh. C, at 7.)  And MAWSS Human Resources Officer Sharon King had never spoken with Herman about a need to accommodate July via air-conditioned trucks because the issue had not arisen during Herman's supervision of July.  (*Id.*; July Dep., Exh. 13, at 7-8.)

resisted.  A witness to this heated discussion was Ricky Pickett, who was chief treatment plant operator and Herman's supervisor.  (July Dep., Exh. 13, at 6.)  As the argument carried on, Pickett told July on three different occasions to stop shouting.  (*Id.* at 6, 11.)  Ultimately, Pickett instructed July to go to Human Resources to discuss the matter further.  (*Id.*)

July proceeded to Human Resources, where he met with MAWSS Human Resources Officer Sharon King.  Even as July met with King to explain his dissatisfaction with Herman ordering him to use truck #16, King learned that the vehicle's air conditioning had previously been repaired and was functioning properly.  (July Aff., ¶ 19; July Dep., Exh. 14, at 7.)  So July left Human Resources, picked up truck #16, and started working by 10:45 a.m..  (July Aff., ¶ 19.) However, he never cleaned the three assigned lift stations that day because he was "called off" by a lift station mechanic pursuant to an emergency situation arising from a power outage at the station.  (July Dep., at 96-97.)

### 2.  *The June 1 Sewage Spill.*

Barely a week later, on June 1, 2011, July was assigned to clean a lift station on Three Mile Creek behind Mobile Infirmary.  (July Dep., Exh. 13 at 5.)  By his own reckoning, July "made a terrible mistake and caused sewage to spill about 75 gals on a hospital ground."  (July Aff., ¶ 21.)  As July explains the incident, his colleague observed sewage leaking from the bottom of the truck, prompting July to "panic" and push the control level the wrong way, exacerbating the leak.  (*Id.*)  MAWSS investigated the incident, and found that July had been negligent in (i) failing to inspect the truck properly in the first instance, which would have revealed that the rear gate was not fully closed; and (ii) compounding the problem by pushing the control lever to open rather than close the valve.  (Doc. 22, Exh. 2, at #21.b.)  In deposition testimony about the June 1 sewage spill, July acknowledged that "the 75-gallon sanitary sewer, that happened.  That was my fault. … I went the wrong way with the lever.  I forgot which way to go."  (July Dep., at 134.)  MAWSS was fined $750 for this spill.  (July Dep., Exh. 13, at 5.)

### 3.  *The June 16 Sewage Leak.*

Just 15 days after the 75-gallon sewage spill, July was involved in another disciplinary incident.  In particular, on June 16, 2011, Herman observed July parking truck #16, but the truck was "leaking a thin stream [of] liquid sewage" from the dump valve on the rear of the vehicle. (July Dep., Exh. 13, at 5-6.)  Notably, Herman saw that the valve cap which would have prevented the leak was not screwed on.  (*Id.* at 6.)  Subsequent inspection of the unit revealed

that a piece of cloth had become wedged in the valve, thereby preventing it from closing and causing the sewage leak.  (*Id.*)

Plaintiff admits that the cap was off.  (July Dep., at 134.)  He also admits that he was responsible for leaving the cap off the valve.  (July Aff., ¶ 24.)  However, July disputes that there was a sewage leak from truck #16 at all.  According to July, he had already cleaned and washed the truck, so there was nothing remaining in the tank that could possibly have been leaking at that time.  (*Id.*)  If anything was in the tank, July contends, it could only have been the clean water used to wash out the truck.  (July Dep., Exh. 13, at 12-13.)

Other MAWSS witnesses disagreed with July's account.  In addition to Herman's eyewitness observations, Gary Stockton, MAWSS' garage supervisor, witnessed truck #16 with the valve cap missing, debris stuck in the valve, and sewage leaking from the valve on the date in question.  (July Dep., Exh. 13, at 7.)  And a station mechanic named David Scarborough indicated that he (not July) cleaned the truck on the morning of June 17, 2011, and that he observed truck #16 at that time to contain debris and liquid sewage.  (*Id.*)

### D. Plaintiff's Termination.

On June 17, 2011, the Board issued a Pre-Disciplinary Notice to July, explaining that disciplinary action was being contemplated against him for "insubordination," "violation of any lawful or reasonable regulations or order made and given by a superior officer," and "negligence."  (July Dep., Exh. 11.)  The Notice elaborated as follows: (i) on May 24, 2011, July had "refused to perform the assigned tasks and became argumentative and loud with [his] supervisor;"[8] (ii) on June 1, 2011, "a 75 gallon Sanitary Sewer Overflow was caused by operator error because [July] failed to properly close the gate on the truck" and "the gate actuator lever

---

[8]     MAWSS has consistently explained that its problem with July's behavior on May 24, 2011 was not that he apprised his supervisor of a need for air conditioning, but that he did so in a manner that was inappropriate, disrespectful and insubordinate.  As MAWSS points out, "He had been repeatedly told by the Supervisor to stop shouting.  Mr. July's conduct was unacceptable."  (Doc. 22, Exh. 2, at #21(a).)  To make matters worse, in MAWSS' view, July's clamor about air conditioning was unnecessary to accommodate his disability because the temperature was well below 80 degrees at that time, there would be an air-conditioned vehicle at the job site if July had required relief in the heat of the day, and he could have simply taken the designated truck to the lift station then contacted Human Resources to address the accommodation issue in a proactive and professional manner, rather than disrupting a meeting and screaming at his supervisor.  (*Id.*)

was operated in the wrong direction;" and (iii) on June 16, 2011, July "left the cap off the discharge valve on Truck #16, allowing the dump valve to leak sewer [*sic*] on the ground."  (*Id.*) The matter was set for pre-disciplinary hearing, at which July was permitted to attend and present witnesses.

Following that hearing, MAWSS notified July by letter dated July 14, 2011 that his employment was terminated, effective immediately, for insubordination, violation of lawful or reasonable regulations or order given by supervisor, and negligence, based on the three incidents described *supra*.  (July Dep., Exh. 12.)  The termination letter also reflected that MAWSS had notified July in a February 4, 2011 suspension letter that "failure to complete all work assignments as directed would be considered insubordination and that failure to follow the directives would result in further disciplinary action, up to and including dismissal."  (*Id.*)

Plaintiff appealed the MAWSS termination decision to the Mobile County Personnel Board, as was his right.  After a hearing, the Personnel Board issued a written order dated September 6, 2011 that affirmed MAWSS' decision.  The Personnel Board's determination was based, at least on part, on the following findings: (i) "July's conduct at the May 24, 2011 morning meeting and thereafter was clearly insubordinate" because July "did not go to the truck as instructed and continued to press his point in a prolonged, loud and argumentative manner;" (ii) July negligently caused and aggravated a sewage spill on June 1, 2011 because he failed to perform a walk-around inspection of his truck that would have revealed a problem with the rear gate, then compounded the error by pushing the control lever in the wrong direction; and (iii) July was negligent on June 16, 2011 in failing to detect and prevent the leak of liquid from his truck, either by inspecting the discharge valve or replacing the valve cap.  (July Dep., Exh. 13, at 14-15.)  The Personnel Board opined that any one of these violations "is sufficient to warrant termination, even when each stands alone," and that the cumulative force of the three of them reinforced the propriety of MAWSS's personnel action.  (*Id.* at 16.)  The Personnel Board further noted that terminating July's employment "is particularly apt in light of July's prior disciplinary record, including a recent 30 day suspension" for insubordination.  (*Id.*)

### E.    The EEOC Charge.

On August 8, 2011, July filed an EEOC Charge of Discrimination against MAWSS.  The Charge, which was signed by July, alleged race discrimination, disability discrimination and retaliation.  July stated, "I believe I was discharged because of my disability and race."  (July

Dep., Exh. 14.)  The EEOC Charge did not mention anything about failure to accommodate a disability, and listed both the "earliest" and "latest" dates of discrimination as being July 14, 2011, thereby communicating that this charge was confined to MAWSS's termination decision, as opposed to a denial of accommodation at an earlier date.  (*Id.*)

The EEOC issued a Right-to-Sue Letter to July on August 29, 2011.  (July Dep., at Exh. 14.)  July initiated this action by filing his Complaint against the Board on November 10, 2011.

### III.    Summary Judgment Standard.

Summary judgment should be granted only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Rule 56(a), Fed.R.Civ.P.  The party seeking summary judgment bears "the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial."  *Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 608 (11th Cir. 1991). Once the moving party has satisfied its responsibility, the burden shifts to the non-movant to show the existence of a genuine issue of material fact.  *Id.*  "If the nonmoving party fails to make 'a sufficient showing on an essential element of her case with respect to which she has the burden of proof,' the moving party is entitled to summary judgment."  *Id.*  (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317 (1986)) (footnote omitted).  "In reviewing whether the nonmoving party has met its burden, the court must stop short of weighing the evidence and making credibility determinations of the truth of the matter.  Instead, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Tipton v. Bergrohr GMBH-Siegen,* 965 F.2d 994, 999 (11th Cir. 1992) (internal citations and quotations omitted). "Summary judgment is justified only for those cases devoid of any need for factual determinations."  *Offshore Aviation v. Transcon Lines, Inc.,* 831 F.2d 1013, 1016 (11th Cir. 1987) (citation omitted).

The Eleventh Circuit has expressly rejected the notion that summary judgment should seldom be used in employment discrimination cases because they involve issues of motivation and intent.  *See Wilson v. B/E Aerospace, Inc.,* 376 F.3d 1079 (11th Cir. 2004).  Rather, "the summary judgment rule applies in job discrimination cases just as in other cases.  No thumb is to be placed on either side of the scale."  *Id.* at 1086 (citation omitted); *see also Williamson v. Clarke County Dep't of Human Resources,* 834 F. Supp.2d 1310, 1318 (S.D. Ala. 2011)

(recognizing and applying rule that summary judgment standard is applied equally in ADA cases as in other kinds of federal actions).

## IV.   Analysis.

July's causes of action against the Board include claims of failure to provide reasonable accommodation, discriminatory discharge, and retaliatory discharge.  These claims are advanced under both the ADA and the Rehabilitation Act.[9]  The Court will examine these theories of liability, and the parties' respective summary judgment arguments concerning each, in turn.

### A.   Failure to Provide Reasonable Accommodation Claim.

One theory of liability animating July's Complaint and summary judgment briefing is that the Board failed to provide him with a reasonable accommodation for an actual or perceived disability (migraine headaches).  The only accommodation identified in July's summary judgment memorandum that he claims the Board failed to provide was an air-conditioned truck on May 24, 2011.  (Doc. 24, at 1, 11-12.)[10]

---

[9]      As a general proposition, the legal standards and analytical framework under both of those statutory schemes are identical.  *See Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005) ("The standard for determining liability under the Rehabilitation Act is the same as that under the Americans with Disabilities Act …; thus, cases involving the ADA are precedent for those involving the Rehabilitation Act.");  *Wolfe v. Postmaster General*, 2012 WL 3792091, *1 (11th Cir. Aug. 31, 2012) ("The legal standards that apply to determine liability under the Rehabilitation Act are the same as those under the Americans with Disabilities Act. … Therefore, the standards developed in ADA cases serve as precedent for claims under the Rehabilitation Act.").  Thus, ADA and Rehabilitation Act claims generally may be considered together.  *See Knowles v. Sheriff*, 2012 WL 573576, *2 (11th Cir. Feb. 23, 2012) ("Claims brought under the Rehab Act … are analyzed under the same framework as the ADA, and, thus, need not be addressed separately.").

[10]      Several misconceptions, tangents and omissions in the parties' filings are properly laid to rest at this juncture.  First, the Board argues in its reply brief that the failure-to-accommodate issue is not part of the case because "July makes no argument in his brief that MAWSS did not accommodate his migraine headaches."  (Doc. 27, at 1.)  The Court declines to adopt such an unreasonably crabbed reading of July's memorandum, which indicates (albeit inartfully) that his ADA and Rehabilitation Act claims hinge in part on MAWSS' failure to provide him with an air-conditioned vehicle on May 24, 2011.  Second, the Court does not credit plaintiff's allegation in his Complaint that defendant failed "on numerous occasions, to provide him a reasonable accommodation."  (Doc. 1, ¶ 65.)  The "numerous occasions" part of that statement is not developed in July's summary judgment brief, which instead focuses exclusively on the May 24 incident.  The Court cannot and will not make a party's summary judgment argument for it, based on record facts that the party has not cited in summary judgment briefing. (Continued)

The law is clear that "an employer's failure to reasonably accommodate a disabled individual *itself* constitutes discrimination under the ADA, so long as that individual is 'otherwise qualified,' and unless the employer can show undue hardship." *Holly v. Clairson Industries, L.L.C.*, 492 F.3d 1247, 1262 (11th Cir. 2007). To state a *prima facie* claim for failure to accommodate, the plaintiff must show that: (i) he is disabled; (ii) he is a qualified individual; and (iii) he was discriminated against by defendant's failure to provide a reasonable accommodation. *See Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249, 1255 (11th Cir. 2001). "The plaintiff bears the burden of identifying an accommodation, and of demonstrating that the accommodation allows him to perform the job's essential functions." *Id.* at 1255-56.

The Board raises numerous objections to the failure-to-accommodate claim, including arguments that the ADA portion of the claim is not properly exhausted, that the Rehabilitation Act portion of the claim fails for want of proof that MAWSS is a recipient of federal funds, that July is not disabled, and the like. However, the Court need look no further than the third element of the *prima facie* case. Again, part of July's threshold burden is to show that MAWSS discriminated against him by failing to provide a reasonable accommodation that would have allowed him to perform the essential functions of his job. The only accommodation identified by plaintiff's summary judgment brief is that July needed to be able to drive or ride in an air-conditioned truck when the outside temperature exceeded 80 degrees. Plaintiff claims that he was denied this reasonable accommodation on the morning of May 24, 2011.

---

*See* Rule 56(c), Fed.R.Civ.P. (clarifying that parties must support their factual positions on summary judgment by "citing to particular parts of materials in the record" and that the court "need consider only the cited materials"); *Williamson*, 834 F. Supp.2d at 1314 n.2 ("The Court will not scour uncited portions of the summary judgment record for evidence that might bolster either side's arguments."). Third, to the extent that plaintiff's evidence or pleadings describe neck or back problems, he has not identified those as disabilities (or as having anything to do with his ADA / Rehabilitation Act claims) in his summary judgment brief; therefore, the sole medical condition at issue for summary judgment purposes is July's migraine headache condition. *See, e.g., Fils v. City of Aventura*, 647 F.3d 1272, 1284 (11th Cir. 2011) ("district courts cannot concoct or resurrect arguments neither made nor advanced by the parties"); *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) ("There is no burden upon the district court to distill every potential argument that could be made based on the materials before it on summary judgment. … Rather, the onus is upon the parties to formulate arguments; grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned.").

Taking the summary judgment record in the light most favorable to July, the Board is entitled to judgment as a matter of law on the failure-to-accommodate claim.  It is undisputed that, as far back as June 2004, defendant borrowed, purchased or otherwise acquired air-conditioned trucks for plaintiff's use to accommodate his migraine headache condition.  From June 2004 through the July 2011 termination of his employment, there is no evidence that July ever – on even a single occasion – was forced to drive or ride in a non-air conditioned MAWSS truck when the outside temperature exceeded 80 degrees, as it frequently does in the notoriously oppressive Alabama summertime.  In other words, the record shows that defendant consistently provided the requested accommodation for July without fail for a period of seven years, from the time he first expressed a need for accommodation until the time his employment at MAWSS came to an end.  Given defendant's demonstrated unfailing willingness to provide the requested relief, plaintiff's failure-to-accommodate claim is devoid of factual support.

This conclusion is not altered one whit by the events of May 24, 2011.  Although plaintiff casts that incident as one in which MAWSS denied him use of an air-conditioned truck, the record does not reasonably support such an inference for several reasons.  As an initial matter, the undisputed facts are that (i) July's supervisor assigned him to drive truck #16 that morning, and (ii) truck #16 had a working air conditioner at that time.  Moreover, even if the air conditioner in truck #16 were broken (which it was not), the outside temperature at the time of the assignment was below the 80-degree threshold identified by July's physician as the level at which accommodation was necessary.  That is to say, July could properly have been assigned a non-air conditioned truck that morning because the temperature was below that at which he required accommodation.[11]  Plaintiff did not require a reasonable accommodation in the early

---

[11]     Plaintiff offers a pair of counterarguments on this point.  Both are meritless.  First, he implies that the 80-degree threshold was not a hard-and-fast rule because a 2007 doctor's note said that he "should be exposed to extreme heat as tolerated."  (July Aff., at Exh. A.)  But everyone – July and MAWSS alike – understood (from another physician's directive) that the applicable threshold was 80 degrees, not some lower number.  At any rate, a 74-degree May morning cannot reasonably be characterized as "extreme heat."  Besides, plaintiff offers no evidence or argument that he would have been unable to "tolerate" driving a non-air conditioned truck on that occasion with the ambient air temperature being 74 degrees.  The "as tolerated" language in the 2007 physician's note does not resuscitate plaintiff's failure-to-accommodate cause of action.  Second, plaintiff points out that the temperature on May 24, 2011 was expected to rise (and in fact did rise) well above the 80-degree benchmark during the heat of the day.  But (Continued)

morning hours of May 24, 2011 in order to be able to perform the essential functions of his job; therefore, any failure by his employer to provide him the requested accommodation does not violate the ADA, as a matter of law. *See, e.g., Holly*, 492 F.3d at 1262 n.16 ("an accommodation that does not enable the employee to perform an essential function of his position is facially unreasonable and is not required by the ADA"); *Ivey v. First Quality Retail Service*, 2012 WL 4219941, *3 (11th Cir. Sept. 21, 2012) ("An accommodation is reasonable and necessary under the ADA only if it will enable the employee to perform the essential functions of the job."). Finally, the fundamental, inescapable truth remains that at no time on May 24, 2011, or any other date, did July find himself in a non-air conditioned truck with the temperature above 80 degrees.

Simply put, the facts in the light most favorable to plaintiff demonstrate no failure to provide reasonable accommodations by defendant. To the contrary, plaintiff has not identified (and apparently cannot identify) a single incident during the final seven years of his employment at MAWSS when he was forced to drive or ride in a non-air conditioned vehicle when the outdoor temperature was above 80 degrees. The accommodation that July had requested was consistently furnished to him. The May 24 episode changes nothing because the truck that he was assigned to drive was air-conditioned, the outdoor temperature was below 80 degrees, and July was fully capable of performing the essential functions of his job that morning without any accommodation whatsoever.

---

so what? There is no indication in the record that July's assignment that morning would last beyond the time when the temperature reached 80 degrees, or that MAWSS would not have accommodated him in that event by supplying a different air-conditioned vehicle (which would have been at the job site anyway (King Dep., at 60)) to drive back from the job. Just because July would have preferred to be accommodated in a different manner does not transform a reasonable accommodation into an ADA violation. *See Earl v. Mervyns, Inc.*, 207 F.3d 1361, 1367 (11th Cir. 2000) ("an employer is not required to accommodate an employee in any manner in which that employee desires") (citation omitted). There are myriad ways in which MAWSS could have reasonably accommodated July's health condition when the temperature crept above 80 degrees on May 24. By insisting on his desired accommodation (*i.e.*, an air-conditioned truck even with the temperature below 80 degrees that morning), July did not afford MAWSS an opportunity to implement any other of the available accommodations once the 80-degree threshold was reached. The ADA affords a plaintiff no luxury to angrily demand a particular accommodation and vehemently refuse all others.

For all of these reasons, the Motion for Summary Judgment is **granted** with respect to plaintiff's claims of failure to accommodate under the ADA and the Rehabilitation Act. Those claims will be **dismissed with prejudice**.

### B.     *Discriminatory Discharge Claim.*

July has also apparently asserted a claim against the Board for discriminatory discharge under the ADA.[12]  The gravamen of this claim is that MAWSS terminated July's employment because he suffers from a disability (migraine headaches) for which he requires reasonable accommodation, and that termination of his employment under those circumstances violates the ADA and the Rehabilitation Act.

There being no direct evidence that MAWSS fired July because he is disabled, this claim must be analyzed using the traditional *McDonnell Douglas* burden-shifting analysis. *See, e.g., Holly*, 492 F.3d at 1255 ("Under the controlling law in this Circuit, the burden-shifting analysis of Title VII employment discrimination claims is applicable to ADA claims.") (citation and internal punctuation omitted); *Cleveland v. Home Shopping Network, Inc.*, 369 F.3d 1189, 1193 (11th Cir. 2004) (applying *McDonnell Douglas* circumstantial evidence framework in ADA context); *Wascura v. City of South Miami*, 257 F.3d 1238, 1242 (11th Cir. 2001) ("In the absence of direct evidence of discrimination, a plaintiff may establish a *prima facie* case of an ADA violation … using the familiar burden-shifting analysis employed in Title VII employment discrimination cases.") (footnote omitted).  Under this methodology, the initial burden rests with the plaintiff to establish a *prima facie* case of discrimination, after which the burden of production shifts to the defendant to articulate a legitimate non-discriminatory reason for the challenged action. *See Cleveland*, 369 F.3d at 1193; *Wascura*, 257 F.3d at 1242-43.  When a non-discriminatory reason is given, the plaintiff is "left with the ultimate burden of proving that [the employer] intentionally discriminated against her because of her disability." *Cleveland*, 369 F.3d at 1193; *see also Wascura*, 257 F.3d at 1243.

To establish a *prima facie* case of disparate treatment under the ADA and Rehabilitation Act, July must show that: (i) he has a disability; (ii) he is a qualified individual; and (iii) the

---

[12]     There is some ambiguity in the pleadings and summary judgment filings as to whether July is asserting a discriminatory discharge claim, separate and apart from his retaliatory discharge claim.  In an abundance of caution, the Court reads these filings broadly and presumes that plaintiff indeed sought to bring a claim of discriminatory discharge.

employer discriminated against him because of his disability.  *See Greenberg v. BellSouth Telecommunications, Inc.*, 498 F.3d 1258, 1263 (11th Cir. 2007); *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005); *D'Angelo v. ConAgra Foods, Inc.*, 422 F.3d 1220, 1226 (11th Cir. 2005).  Assuming (without deciding) that the first two elements are satisfied, plaintiff's claim for discriminatory discharge nonetheless fails because he has not shown that MAWSS fired him "because of" his migraine headache condition.  Undisputed record facts show that MAWSS had been aware of (and had voluntarily gone to great lengths to accommodate) July's propensity for migraine headaches for many years.  Most notably, defendant procured an air-conditioned truck for him to use, for the purpose of relieving his heat-induced headaches.  This lengthy track record of acceptance and accommodation, without any detrimental consequences to defendant's operations or plaintiff's job assignments or career progression, cannot logically be reconciled with the discriminatory animus that July now imputes to MAWSS.  July has failed to identify any facts that he contends give rise to a reasonable inference of a causal relationship between his long-accommodated migraine headache condition and defendant's termination decision.[13]  There is simply no evidence and no reason to think that plaintiff's dismissal had anything to do with his long-standing susceptibility to migraine headaches when driving non-air conditioned vehicles in hot weather.

---

[13]        At most, plaintiff appears to hinge causation on a theory that his supervisor, Terry Herman, intentionally refused to accommodate July's disability on May 24, thereby provoking the altercation that constituted one ground for the termination decision.  But defendant's evidence is that Herman was unaware of any continuing need for accommodation on July's part that morning.  Obviously, an employer cannot discriminate against an employee based on a disability that it does not know he has.  *See generally Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1185 (11th Cir. 2005) ("an employee cannot be fired 'because of' a disability unless the decisionmaker has *actual* knowledge of the disability," and constructive knowledge is not sufficient).  To be sure, plaintiff speculates that Herman knew of his disability based on an incident that occurred a year earlier; however, he does not present any evidence that Herman remained aware of July's condition and need for accommodation as of the time he gave the assignment.  Speculation will not suffice.  *See id.* ("Speculation does not create a *genuine* issue of fact; instead, it creates a false issue, the demolition of which is a primary goal of summary judgment.") (citation omitted).  Nor was Herman aware that the air-conditioning system in truck #16 was broken, which as a factual matter it was not.  So the idea that Herman intentionally provoked him that day by assigning July to a truck with a broken air conditioner, all because he did not like having a disabled subordinate, is utterly lacking in factual support.

Even if July had made a *prima facie* showing of disability discrimination as to his discharge, the claim would still fail as a matter of law. Defendant has presented a compelling legitimate, nondiscriminatory reason for firing him. In particular, defendant has explained that July was discharged because he was disruptive and got into a heated verbal altercation with his direct supervisor on May 24, 2011, then negligently caused a sizeable sewage spill on June 1, 2011, barely a week later, all within a short time after returning from a 30-day disciplinary suspension for insubordination. (Doc. 21, at 9.)[14] To defeat the Board's summary judgment motion on the discriminatory discharge claim, July must make a showing of pretext as to each of these stated reasons. *See, e.g., Chapman v. AI Transport*, 229 F.3d 1012, 1037 (11th Cir. 2000) ("In order to avoid summary judgment, a plaintiff must produce sufficient evidence for a reasonable factfinder to conclude that each of the employer's proffered nondiscriminatory reasons is pretextual.").

---

[14]     Two caveats are pertinent, with respect to this legitimate nondiscriminatory explanation for July's termination. First, plaintiff correctly observes that, for whatever reason, defendant's principal brief does not identify the June 16 incident as a legitimate, non-discriminatory reason for July's termination. Accordingly, that incident is off the table and will not be examined further on summary judgment as a justification for the challenged discharge decision. Second, for summary judgment purposes, the Court does not credit defendant's statement that he was fired because "even after [July] was informed Truck #16's air conditioning was operative he did not complete the assignments given him." (Doc. 21, at 9.) Genuine issues of material fact remain concerning this issue. July's testimony was that he did not complete the lift-station cleaning assignments that day because he was "called off" by an emergency power outage at a lift station. (July Dep., at 97.) Accepting this testimony as true, a reasonable jury could find that July failed to complete his lift-station cleaning assignment on May 24 not because of insubordination, but because MAWSS called him off that assignment; therefore, insofar as the Board contends that it fired July for failing to complete his assigned lift-station cleanings that day, plaintiff has adequately shown pretext. Again, plaintiff's evidence is that he did not complete those assignments only because MAWSS called him off, not because he was being obstinate or insubordinate. Of course, that determination itself is not sufficient to warrant denial of the Rule 56 Motion; rather, the law requires a plaintiff to show that each of the employer's stated reasons for the challenged action are pretextual in order to get past summary judgment. *See, e.g., Crawford v. City of Fairburn, Ga.*, 482 F.3d 1305, 1308 (11th Cir. 2007) ("If the employer proffers more than one legitimate, nondiscriminatory reason, the plaintiff must rebut each of the reasons to survive a motion for summary judgment."). The point is that the Board cannot prevail at this time on the "failure-to-complete-assignments" rationale for July's termination because the record in the light most favorable to plaintiff demonstrates that he was only following orders, and not being insubordinate, in not completing the job.

To show that an employer's stated reason is pretext for unlawful discrimination, the plaintiff's evidence "must reveal such weaknesses, implausibilities, inconsistencies, incoherencies or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could find them unworthy of credence." *Vessels v. Atlanta Independent School System*, 408 F.3d 763, 771 (11th Cir. 2005) (quotation omitted); *see also Rioux v. City of Atlanta, Ga.*, 520 F.3d 1269, 1278 (11th Cir. 2008) ("The plaintiff must demonstrate weaknesses or implausibilities in the employer's proffered legitimate reasons for its action sufficient for a reasonable factfinder to disbelieve the reasons."). "If the proffered reason is one that might motivate a reasonable employer, a plaintiff cannot recast the reason but must meet it head on and rebut it. … Quarreling with that reason is not sufficient." *Wilson*, 376 F.3d at 1088.

In an effort to satisfy the pretext burden, plaintiff first argues that the May 24 incident was not insubordination "as a matter of law" because plaintiff was simply invoking his statutory right to reasonable accommodation for his disability. (Doc. 24, at 24.) Certainly, the ADA gives an employee a protected right to engage a supervisor in dialogue concerning a reasonable accommodation that the employee needs in order to be able to perform the essential functions of his job. However, the ADA does not immunize an employee from discipline or discharge if he expresses that request for accommodation in an insubordinate or otherwise inappropriate manner. *See, e.g., Kiel v. Select Artificials, Inc.*, 169 F.3d 1131, 1136 (8th Cir. 1999) ("Kiel's requests for a TDD were protected communications. Insulting Ms. Fry and indulging in an angry outburst in the presence of co-workers, however, were certainly not, for the ADA confers no right to be rude.").[15] So the fact that July was telling his supervisor that he needed an air-conditioned truck

---

[15]     *See also Culver v. Gorman & Co.*, 416 F.3d 540, 548 (7th Cir. 2005) ("[W]e have consistently held that an employee's insubordination toward supervisors and coworkers, even when engaged in protected activity is justification for [termination]."); *Seaman v. CSPH, Inc.*, 179 F.3d 297, 301 (5th Cir. 1999) (no pretext even though employer fired employee moments after employee said he had filed discrimination complaint, where termination decision was for employee's insubordination during that conversation, including screaming at supervisor); *Equal Employment Opportunity Com'n v. Mike Hooks, Inc.*, 2011 WL 1807369, *16 (W.D. La. May 11, 2011) ("The opposition clause was not intended to immunize insubordinate, disruptive, or nonproductive behavior at work.") (citations and internal quotation marks omitted); *Barber v. C1 Truck Driver Training, LLC*, 2010 WL 4095322, *12 (E.D. Ark. Oct. 18, 2010) ("Title VII's prohibition of retaliation for protected activity does not insulate an employee from the consequences of insubordination.").

for medical reasons in no way insulates him from discipline or dismissal for expressing that sentiment in a disruptive, insubordinate, defiant, and loud manner.  Tellingly, July does not deny that he yelled at Herman both in and after the department-wide meeting, that he refused to follow the directive that he take truck #16 (for which he required no accommodation because the temperature was below 80 degrees and the air conditioning actually worked), that he behaved in a confrontational and insubordinate manner, or that he refused to calm down even after chief treatment plant operator Ricky Pickett told him three different times to stop shouting.[16]  This type of behavior goes far beyond merely invoking a right to reasonable accommodation under the ADA, and was a permissible nondiscriminatory ground for discipline and/or dismissal.

Next, July suggests that the decision to fire him for the May 24 incident was pretextual because "[l]oudness was not against company policy and was part of the culture on the ground." (Doc. 24, at 24.)  But July's behavior on May 24 went far beyond a "loudness" issue.[17]  He was disruptive, disrespectful and argumentative.  He refused to follow Herman's instructions that he go to truck #16.  He would not quiet down even when Herman's boss told him three times to do so.  As the Personnel Board found, "July's conduct at the May 24, 2011 morning meeting and thereafter was clearly insubordinate ….  Regardless of the repair status of truck 16, July's conduct was unacceptable."  (July Dep., Exh. 13, at 14-15 (footnote omitted).)  The record unambiguously supports these determinations, and plaintiff's attempt on summary judgment to minimize his own misconduct as mere "loudness" that was part of the workplace "culture" is unpersuasive and takes undue and unwarranted liberties with the facts.

---

[16]      In his affidavit, July alleges that he explained the situation "in a calm voice" to Human Resources later that morning (July Aff., ¶ 19); however, he says nothing about his tone of voice, demeanor, or comportment toward Herman during the incident itself.  So the only evidence before the Court on that score is defendant's showing that July presented his request in an angry, rude, confrontational, loud and prolonged outburst.

[17]      It certainly was not an issue of workplace culture, either.  As defendant's human resources officer testified, "It wasn't anything about culture.  It was an argument between an employee and a supervisor."  (King Dep., at 68.)  And plaintiff has identified nothing about the "culture" of MAWSS that would allow an employee to disrupt a department meeting, refuse a supervisor's direct instructions, then carry on in a confrontational manner, refusing to lower his voice despite multiple directives that he do so.

Plaintiff also contends that the Board's stated reasons for terminating his employment were a pretext for disability discrimination insofar as the Board purported to rely on the June 1, 2011 sewage incident.  To be sure, July does not deny that 75 gallons of sewage spilled from his truck, or that it was his fault; to the contrary, he admits that he made a "terrible mistake."  Nonetheless, he insists that other MAWSS employees were not terminated for negligence, so it must have been pretextual for defendant to recite that reason as a ground for the challenged personnel decision.  The trouble with plaintiff's argument is that he does not identify any other employee who was similarly situated, but instead waves his hand in conclusory fashion at a 17-page exhibit listing instances of damage to vehicle or equipment by MAWSS employees.  (Doc. 25, Exh. G.)[18]  It is not this Court's responsibility to sift through the dozens of entries in this exhibit to locate someone who plaintiff might think is similarly situated to himself.  Besides, cursory inspection of this exhibit reveals that it consists of a laundry list of mostly-minor incidents of property damage (*i.e.*, cracked windshields, bent bumpers, etc.) that may or may not have been the product of employee negligence at all.  Indeed, from Exhibit G, it is impossible to discern whether any of numerous incidents resulted from employee negligence.  Certainly, none appear to have involved significant sewage spills caused by an employee's self-described "terrible mistake" on duty.  So Exhibit G does not appear to document any other sewage spills caused by an employee who (i) negligently failed to inspect the rear gate of the truck, then (ii) panicked when he realized what was happening and pushed the control lever in the wrong direction, all after (iii) amassing a serious, recent disciplinary history.  In short, plaintiff has

---

[18]     To be sure, a plaintiff can show pretext by showing that the employer treated similarly situated employees differently.  But "similarly situated" means what it says.  "When a plaintiff alleges discriminatory discipline, to determine whether employees are similarly situated, we evaluate whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways." *Burke-Fowler v. Orange County, Fla.*, 447 F.3d 1319, 1323 (11th Cir. 2006) (citation and internal quotation marks omitted).  For purposes of the "similarly situated" analysis, "[w]e require that the quantity and quality of the comparator's misconduct be nearly identical to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges." *Id.* (citations omitted); *see also McCann v. Tillman*, 526 F.3d 1370, 1373-74 (11th Cir. 2008) (similar).  Plaintiff has come forward with no evidence that comes close to satisfying this exacting standard.  For aught the record shows, MAWSS has never treated anyone differently than July with respect to the June 1 sewage spill.

identified no individuals who committed "terrible mistakes" such as July's actions of June 1, 2011, directly causing a 75-gallon sewage spill, who were not terminated on negligence grounds.

Finally, plaintiff endeavors to derive pretext from defendant's consideration of July's disciplinary record (including his recent 30-day suspension) in deciding that termination of employment was the appropriate action to take based on the May 24 and June 1 incidents. According to plaintiff, because he was not discharged at the time of those prior acts of misconduct, those events could not form the basis for his termination in July 2011.  (Doc. 24, at 25.)[19]  This argument misses the point.  In formulating disciplinary action, an employer is not bound to consider a particular misdeed in isolation, without the guidance and context of the employee's prior disciplinary history.  *See, e.g., Karpel v. Inova Health System Services*, 134 F.3d 1222, 1228 (4th Cir. 1998) ("It would defy logic to look at each sort of attendance, disciplinary, or performance problem in a vacuum; it is the conglomeration of these issues that made Ms. Karpel an unsatisfactory employee that Inova was justified in terminating."); *Maniccia v. Brown*, 171 F.3d 1364, 1369 (11th Cir. 1999) (rejecting plaintiff's proposed comparators who had been involved in a single incident of misconduct, whereas plaintiff committed at least four policy violations); *Hudson v. Norfolk Southern Ry. Co.*, 209 F. Supp.2d 1301, 1333 (N.D. Ga. 2001) ("Even where the Plaintiff identifies a comparator who committed a similar disciplinary infraction, that co-worker is not similarly situated if Plaintiff has a history of deficient performance and the comparator is not alleged to have such a record.").  July's disciplinary record prior to the May 24 and June 1 events is unquestionably a proper, non-pretextual factor

---

[19]    Plaintiff also suggests in the "Conclusion" section of his brief that it was a mere "afterthought" for MAWSS to link July's termination to his prior disciplinary history.  (Doc. 24, at 28.)  Not so.  It is obvious that the incidents for which July was being disciplined must be considered in the context of his employment history.  Logic and common sense dictate as much.  Besides, nothing that MAWSS ever said or did communicated that July's disciplinary history was not a factor in deciding what punishment to impose for the stated violations.  The July 14 termination letter expressly referred to his recent suspension.  And the Personnel Board's Order affirming the termination decision noted that "[t]his sanction is particularly apt in light of July's prior disciplinary record, including a recent 30 day suspension."  (July Dep., Exh. 13, at 16.)  Plainly, then, defendant's summary judgment references to July's disciplinary history are not a *post hoc*, shifting rationale for the termination decision that might evince pretext, but are instead articulation of a common-sense consideration that was evident all along, to-wit: That the appropriate discipline to impose depends not only on the misconduct involved, but also the employee's disciplinary record.

that MAWSS was entitled to consider in deciding what discipline to mete out for those two incidents.  Insofar as plaintiff argues otherwise, that contention fails as a matter of law.[20]

Again, a plaintiff's burden of showing pretext requires that he identify such weaknesses, implausibilities, inconsistencies, incoherencies or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could find them unworthy of credence.  July has not done so.  The evidence in the light most favorable to plaintiff shows that defendant reasonably determined that he had been insubordinate and disruptive on May 24, 2011; that he had negligently caused a large sewage spill on June 1, 2011; and that those incidents, combined with his disciplinary record at MAWSS (including a 30-day suspension that he had recently served), warranted the termination of his employment.  On this record, a reasonable jury could not find that MAWSS's stated reasons for firing July were a pretext, and that the real reason MAWSS fired July was that he suffered from migraine headaches.  Summary judgment is appropriate on plaintiff's discriminatory discharge claim.

> ### C.      *Retaliation Claim.*

Plaintiff also asserts a claim of retaliatory discharge under the ADA and the Rehabilitation Act.  To make out a *prima facie* case of retaliation under the ADA, a plaintiff must show the following three elements: "first, the plaintiff engaged in statutorily protected conduct; second, the plaintiff suffered an adverse employment action; and finally, the adverse action was causally related to the protected expression."  *Farley v. Nationwide Mut. Ins. Co.*, 197 F.3d 1322, 1336 (11th Cir. 1999) (elements of a retaliation claim are the same under ADA and Title VII); *see also Lucas*, 257 F.3d at 1260.  "Once a *prima facie* case is established, the burden then shifts to the defendant employer to come forward with legitimate non-discriminatory reasons for its actions that negate the inference of retaliation."  *Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1287 (11th Cir. 1997); *see also Anderson v. JPMorgan Chase & Co.*, 2011 WL 989847, *2 (11th Cir. Mar. 22, 2011) (similar).  "The plaintiff must then

---

[20]      Equally unavailing is plaintiff's contention that the Board "fail[ed] to raise July's alleged prior acts in its principle [*sic*] brief," and that said omission "is a waiver of this line of argument."  (Doc. 24, at 25 n.9.)  In explaining its reasons for terminating July's employment, the Board's principal brief on summary judgment expressly discussed the May 24 and June 1 incidents "combined with July's prior discipline record including his just recent thirty (30) day suspension," and identified these factors in the aggregate as "a sufficient reason for his dismissal."  (Doc. 21, at 9.)  Plaintiff's waiver argument is thus counterfactual.

demonstrate that it will be able to establish at trial that the employer's proffered non-discriminatory reasons are a pretextual ruse designed to mask retaliation." *Stewart*, 117 F.3d at 1287; *see also Anderson*, 2011 WL 989847, at *2 (similar).

Assuming that July has made a *prima facie* showing of retaliation, the fact remains that the Board has come forward with legitimate non-retaliatory reasons for terminating his employment. And plaintiff's pretext arguments are no different (and fare no better) in the retaliation context than in the disability discrimination context. No constructive purpose would be served by reiterating the pretext analysis from § IV.B., *supra*; however, it applies with equal force here. Plaintiff has not shown that the Board's stated legitimate reasons for terminating his employment were a pretext for unlawful retaliation for his May 24 request for accommodation. On this record, no reasonable jury could conclude that the real reason the Board fired plaintiff was because of his protected act of requesting an air-conditioned truck (which the Board had voluntarily provided him for seven years) on May 24, 2011; rather, the record clearly shows that July was fired for being disruptive, insubordinate and defiant to his supervisor on May 24, and for single-handedly causing a large sewage leak through his own negligent conduct on June 1, all viewed through the lens of his serious recent disciplinary history at MAWSS. Accordingly, defendant is entitled to summary judgment on the retaliatory discharge cause of action.[21]

---

[21] Plaintiff contends that "a reasonable juror could surmise from examining the objective facts that Terry [*sic*], smarting over his belief that his authority was being undermined by July's insistence upon an air condition [*sic*] truck, decided to punish him by recommending his termination." (Doc. 24, at 29.) No doubt, Terry Herman had reason to be upset, but not because of the requested accommodation (which MAWSS had been providing to July for the last seven years). Instead, Herman had reason to be upset because of July's hostile, confrontational, and insubordinate tone, as well as his refusal to follow orders. Certainly, July was undermining Herman's authority on May 24, 2011, but not by requesting an accommodation. Had he wished to do so, July could have made that request in a manner that did not insult his supervisor. By electing to scream and shout, and to refuse to obey when the temperature was still below 80 degrees, July engaged in unprotected conduct. Plaintiff's argument to the contrary selectively ignores critical facts, and skews the record beyond what any reasonable juror could find. At any rate, Herman was not the decisionmaker, but merely made a recommendation to his manager. (King Dep., at 11.) It was the Board (not Herman) who made the decision (after a hearing) to terminate July's employment. And it was the Personnel Board (not Herman) who made the decision (after another hearing) to uphold that termination decision. Plaintiff imputes no discriminatory or retaliatory animus to the Board or the Personnel Board, nor does he identify any facts that might reasonably support a conclusion that Herman exerted control over those entities, that the hearings were a farce or empty formality, or that the Board and Personnel Board (Continued)

As a last-ditch effort to revive his retaliation claim, plaintiff argues (in conclusory terms) that the "mixed-motive" theory of liability applies and "compels a ruling that his ADA claims survive summary disposition." (Doc. 24, at 27.) As a threshold matter, multiple appeals courts have recently deemed the mixed-motive framework unavailable in the ADA or Rehabilitation Act context. *See, e.g., Palmquist v. Shinseki*, 689 F.3d 66, 77 (1st Cir. 2012) ("The only way to give the wording of section 501 any practical effect is to find that the ADA's but-for causation standard controls whether a defendant is liable for retaliation. Where, as here, that standard has not been satisfied, the Rehabilitation Act dictates that Title VII's mixed-motive remedies do not pertain."); *Lewis v. Humboldt Acquisition Corp.*, 681 F.3d 312, 317 (6th Cir. 2012) ("The words 'a motivating factor' appear nowhere in the ADA but appear in another statute: Title VII. … [W]e have no license to import 'a motivating factor' from Title VII into the ADA."); *Serwatka v. Rockwell Automation, Inc.*, 591 F.3d 957, 964 (7th Cir. 2010) ("given the lack of a provision in the ADA recognizing mixed-motive claims, such claims do not entitle a plaintiff to relief for disability discrimination").[22] "[W]hether a mixed motive theory is cognizable under the ADA is still an open question in this circuit." *Parsons v. First Quality Retail Services, LLC*, 2012 WL 174829, *8 (M.D. Ga., Jan. 20, 2012).

Nonetheless, this Court does not need to resolve whether a mixed-motive theory is or is not available under the ADA. Even if it is, plaintiff's claims still fail as a matter of law. After all, "the first step in a mixed-motive case is for the plaintiff to present sufficient evidence for a

---

simply "rubber-stamped" Herman's recommendation, without any critical thought or analysis of their own. All record facts are to the contrary. And there is no indication that MAWSS or the Personnel Board were "smarting" or unhappy that July had requested an accommodation which they had been providing to him without incident for the last seven years.

[22]     The lone authority cited by plaintiff for the proposition that a mixed-motive theory is applicable to ADA cases is *McNely v. Ocala Star-Banner Corp.*, 99 F.3d 1068 (11th Cir. 1996). However, plaintiff's reliance on *McNely* for this point is of dubious merit, given the Supreme Court's 2009 ruling in *Gross v. FBL Financial Services, Inc.*, 557 U.S. 167, 129 S.Ct. 2343, 174 L.Ed.2d 119 (2009), that a mixed-motive jury instruction is improper under the Age Discrimination in Employment Act because "[t]he burden of persuasion does not shift to the employer to show that it would have taken the action regardless of age, even when a plaintiff has produced some evidence that age was one motivating factor in that decision." 557 U.S. at 180. The appellate authorities cited *supra* have applied *Gross* to the similar statutory language in the ADA and Rehabilitation Act.

reasonable jury to conclude his [disability] was a motivating factor in the challenged employment decision." *Woods v. Austal, U.S.A., LLC*, 2011 WL 1380054, *10 (S.D. Ala. Apr. 11, 2011) (citation and internal quotation marks omitted); *see also Lewis v. Metropolitan Atlanta Rapid Transit Authority*, 2009 WL 2599571, *4 (11th Cir. Aug. 25, 2009) (plaintiff's discrimination claims do not survive summary judgment under a mixed-motive framework where plaintiff "has failed to present sufficient evidence for a reasonable jury to conclude his race was a motivating factor in the MARTA defendants' decision to terminate him"). As explained in detail, *supra*, the evidence in the record, viewed in the light most favorable to plaintiff, does not support a reasonable inference that July was terminated for having migraine headaches or for requesting an air-conditioned truck. Nothing that MAWSS said or did would enable a reasonable factfinder to conclude that his disability or request for accommodation was a motivating factor in the termination decision. Accordingly, even assuming that a mixed-motive theory can ever be viable in the ADA or Rehabilitation Act context, July cannot avoid summary judgment by invoking such a theory here.

V.    **Conclusion.**

For all of the foregoing reasons, it is **ordered** as follows:

1.    Defendant's Motion for Summary Judgment (doc. 20) is **granted**;

2.    Defendant's Motion to Strike (doc. 26) is **moot** because none of the objected-to exhibits affect the foregoing analysis in any material way;

3.    There being no genuine issues of material fact as to any claim or cause of action asserted herein, this action is **dismissed with prejudice**; and

4.    A separate judgment will enter.


DONE and ORDERED this 29th day of November, 2012.


                                        s/ WILLIAM H. STEELE
                                        CHIEF UNITED STATES DISTRICT JUDGE